_____

No. 95-2260
_____

Insty\*Bit, Inc.,    \*
                                    \*
            Appellant,    \*
                                    \* Appeal from the United States
    v.                          \* District Court for the
                                    \* District of Minnesota
Poly-Tech Industries, Inc.,    \*
                                    \*
            Appellee.    \*

_____

Submitted:  December 13, 1995

Filed:  September 10, 1996
_____

Before McMILLIAN, JOHN R. GIBSON and BEAM, Circuit Judges.
_____


McMILLIAN, Circuit Judge.


    Insty\*Bit, Inc. (Insty\*Bit) appeals from a final order entered in the
United States District Court for the District of Minnesota granting summary
judgment in favor of Poly-Tech Industries, Inc. (Poly-Tech) on Insty\*Bit's
claim of trade dress infringement in violation of § 43(a) of the Lanham
Act, 15 U.S.C. § 1125.[1]  Insty\*Bit, Inc. v. Poly-Tech Indus., Inc., No. 3-
94-1427 (D. Minn. Apr. 26, 1995) (Memorandum and Order).  For reversal,
Insty\*Bit

_____

    [1]Insty\*Bit also raised the following state law claims pursuant
to 28 U.S.C. § 1367(a): (1) violation of Minn. Stat. § 325D.44 et
seq. (the Minnesota Deceptive Trade Practices Act); (2) common law
fraud; (3) negligent misrepresentation; (4) breach of fiduciary
duty; and (5) unjust enrichment.  After granting summary judgment
in favor of Poly-Tech on the Lanham Act claim, the district court
declined to exercise supplemental jurisdiction over these state law
claims and dismissed them without prejudice.  See slip op. at 15-
16.

argues the district court erred in holding that Insty*Bit had failed to create a genuine issue of material fact with respect to its trade dress infringement claim under 15 U.S.C. § 1125. For the reasons discussed below, we reverse the judgment of the district court and remand the case to the district court for further proceedings consistent with this opinion.

## I. Background

Insty*Bit is a Minnesota corporation located in Minneapolis, Minnesota. It designs, assembles, and sells quick-change drill chucks[2] and related accessories, including drill bits, countersinks, and drill guides.

Poly-Tech, also a Minnesota corporation located in Minneapolis, operates primarily as a "job shop" for the manufacture of component parts for other entities. Between 1988 and August 1994, Poly-Tech manufactured component parts for Insty*Bit's products to Insty*Bit's specifications. Insty*Bit would then assemble these components with other parts to produce the quick-change drill chuck and related accessories.

In late 1989, Insty*Bit granted Poly-Tech permission to sell Insty*Bit products, along with the products of other manufacturers, through woodworking trade shows and magazine advertisements. Although Insty*Bit contends that it gave Poly-Tech an exclusive limited sales territory in three eastern states and specified the trade shows at which Poly-Tech could sell Insty*Bit's products, Poly-Tech maintains that Insty*Bit placed no restrictions on its sales territory or methods. It is undisputed, however, that Poly-Tech sold Insty*Bit products in various advertisements and woodworking shows until August 1994. At the same time, Insty*Bit

---

[2]A quick-change drill chuck allows the user to change bits and drivers in a portable drill without a chuck key.

also engaged in "private labeling" with several national distributors of woodworking products. Specifically, it allowed four distributors to sell Insty*Bit's products in connection with another company's brand name. According to Insty*Bit, it has eight national distributors of its products. In addition to the four distributors which sell Insty*Bit's products under another brand name, two distributors sell unmarked products, and two others sell them under Insty*Bit's label.

In 1993, Poly-Tech developed its own quick-change drill chuck. Poly-Tech filed a patent application for this quick-change chuck with the United States Patent Office on December 23, 1993, and a patent (No. 5,398,946) was subsequently issued on March 21, 1995. II Poly-Tech App. at 309. In August 1994, Poly-Tech informed Insty*Bit that it was adding its own brand of quick-release drills and accessories, under the name "Snappy," to its product line. Shortly thereafter, Insty*Bit ceased placing orders for Insty*Bit component parts and instructed Poly-Tech not to sell Insty*Bit products in the future.

On October 14, 1994, Insty*Bit instituted the present suit against Poly-Tech in the United States District Court for the District of Minnesota, alleging trade dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125, violation of Minn. Stat. § 325D.44 et seq. (the Minnesota Deceptive Trade Practices Act); common law fraud; negligent misrepresentation, breach of fiduciary duty, and unjust enrichment. Insty*Bit sought damages, preliminary and permanent injunctive relief, and attorney's fees. Poly-Tech then filed a counterclaim for sanctions pursuant to Fed. R. Civ. P. 11, Minn. R. Civ. P. 11, and Minn. Stat. § 549.21. Upon motion by Poly-Tech, the district court granted summary judgment in favor of Poly-Tech on Insty*Bit's Lanham Act claim and dismissed Insty*Bit's state law claims without

prejudice pursuant to 28 U.S.C. § 1367(c)(3).  See slip op. at 2, 17.[3]
Insty*Bit then filed this timely appeal.

## II.  Discussion

### A.    Standard of Review

We review a grant of summary judgment de novo.  The question before the district court, and this court on appeal, is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992); St. Paul Fire & Marine Ins. Co. v. FDIC, 968 F.2d 695, 699 (8th Cir. 1992).  Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate.  Crain v. Board of Police Comm'rs, 920 F.2d 1402, 1405-06 (8th Cir. 1990).

### B.    Lanham Act Claim

Section 43(a)[4] of the Lanham Act, 15 U.S.C. § 1125(a)(1),

---

[3]The district court also denied on mootness grounds Insty*Bit's motion for a preliminary injunction and its motion to dismiss Poly-Tech's counterclaim.  See slip op. at 2, 17.

[4]Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), provides in pertinent part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact,

creates a federal cause of action for trade dress infringement.  The trade dress of a product is the "total image of a product, the overall impression created, not the individual features."  Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 868 (8th Cir. 1994) (Aromatique); Woodsmith Publishing Co. v. Meredith Corp., 904 F.2d 1244, 1247 (8th Cir. 1990) (Woodsmith). A trade dress is entitled to protection under § 43(a) of the Lanham Act if: (1) it is inherently distinctive or has acquired distinctiveness through secondary meaning; (2) it is primarily nonfunctional; and (3) its imitation would result in a likelihood of confusion in consumers' minds as to the source of the product. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769 (1992) (Two Pesos).  With respect to the third prong of this analysis, we established in Co-Rect Prods, Inc. v. Marvy! Advertising Photography, Inc., 780 F.2d 1324, 1330 (8th Cir. 1985) (Co-Rect), that the following six factors are to be considered in determining whether a likelihood of confusion exists: (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the

---

which  --

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval or his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

alleged infringer's intent to "pass off" its goods as those of the owner; (5) incidents of actual confusion; and (6) the type of product, its costs, and conditions of purchase.[5]

Insty*Bit alleged before the district court that Poly-Tech had copied the trade dress of Insty*Bit's products in manufacturing the Snappy line of quick-change drill chuck, countersink and drill guide.[6]  The district

_____

[5]In <u>Co-Rect</u> we considered the likelihood of confusion issue with respect to trademark, rather than trade dress, infringement. In light of the Supreme Court's holding in <u>Two Pesos</u>, 505 U.S. at 774-76, that there is no textual basis for applying different analyses to the protection of trademarks and trade dress under section 43(a) of the Lanham Act, we conclude that the six <u>Co-Rect</u> factors also govern claims of trade dress infringement.  <u>Cf.</u> <u>Aromatique</u>, 28 F.3d at 868 ("The difference between trade dress and trademark is no longer of importance in determining whether trade dress is protected by federal law").

[6]Specifically, Insty*Bit contended that Poly-Tech had infringed upon the following trade dress of Insty*Bit products:

> <u>Quick-change chuck</u> - the combination of the color black; the shape of the shank; the size and dimensions of the sleeve; and the chamfered edge-raised knurled band-recessed smooth band-raised knurled band appearance of the chuck sleeve;
>
> <u>Drill guide</u> - the combination of the color black; the steel colored bit; the exposed spring; the shape and style of the set screw and opening; and the shape of the opening for receiving the shank in the collar;
>
> <u>Countersink</u> - the combination of the color black; the shape and style of the set screw and opening; the use of two flutes; the shape of the collar; the raised edge on the countersinking portion; the overall size and dimensions; and the shape of the opening for receiving the shank in the collar.

Slip op. at 8-9.

court held that Insty*Bit had failed as a matter of law to create a genuine issue of material fact regarding

the likelihood of consumer confusion as to the source of the Snappy brand products.  Slip op. at 10-15.  The district court opined that "[a]lthough the Insty*Bit products and the Snappy products compete in the same market, independent application of the six <u>Co-Rect</u> factors is unnecessary in this case." <u>Id.</u> at 10.  The district court then conducted a visual inspection of the packaging of the Snappy and Insty*Bit products and determined that the "packaging designs are so graphically dissimilar that there is no reasonable likelihood that consumers would confuse a Snappy brand product with the Insty*Bit product."  <u>Id.</u> at 11.[7]

---

[7]The district court observed:

> Poly-Tech has left no doubt as to the source of the Snappy brand products. . . . The words "Snappy™" appear in large letters prominently displayed on the front of the Snappy packages for each of the three products claimed to violate § 1125.  Indeed, the brand name "Snappy" appears in bold letters <u>nine times</u> on the Snappy quick-release chuck package and in bold letters <u>six times</u> on each of the Snappy countersink and drill guide packages.  "Snappy" is also permanently embossed on the face of each of the components themselves, and the embossed imprint is visible through clear plastic "bubble" packaging.  Each Snappy package also contains the name "Poly-Tech Ind." along with its mailing address . . . The front face of each of the Snappy packages is solid purple with white lettering and yellow accent highlighting.
>    In contrast, the front . . .[and back] face[s] of the Insty*Bit product packages contai[n], in large, bold letters the word "INSTY-BIT." . . . The front of these packages is solid white, not purple. . . . Based on the "total presentation" of the Snappy brand products to the consumer, there is no reasonable likelihood of confusion as to their source.

Slip op. at 11-12.

In determining that there was no likelihood of confusion regarding the source of the products at issue, the district court declined to give weight to a survey offered by Insty*Bit of approximately one hundred potential quick-change drill customers. Id. at 13-15.[8] The survey expert had found that a statistically significant number of the respondents interviewed would purchase the Snappy brand products as a satisfactory match to Insty*Bit's. See Report of Jeffrey Stitt; Insty*Bit App. at 257. The district court, however, held that the fact that a statistically significant number of consumers would substitute the Snappy brand products for Insty*Bit's was "irrelevant" to the likelihood of confusion issue, because "the issue here is not whether consumers would substitute the defendant's product for the plaintiff's nor is it whether the products are similar; the issue is whether consumers would likely purchase the defendant's product mistakenly thinking it was manufactured by the plaintiff." Slip op. at 14-15. Similarly, the district court also rejected as non-probative the portion of the survey which tested consumer confusion with respect to unpackaged Snappy and Insty*Bit quick-change systems. Consumer reactions to the unpackaged product bore no relevance to the likelihood of confusion issue, the district court reasoned, because "to determine whether a substantial likelihood of confusion exists under § 1125, the product must be considered in its totality as it is presented to the average consumer -- which in this case is to say in . . . [packaged form]." Id. at 14. Based on its visual inspection of

_____

[8]The expert retained by Insty*Bit surveyed 102 consumers who had used a portable drill within the past three months. Fifty-four percent of the consumers were professional woodworkers, and forty-six percent were amateurs. The survey expert showed each participating consumer both unpackaged and packaged quick-change drill products manufactured by Snappy, Insty*Bit, and Vermont American (a competing manufacturer). The consumer was allowed to examine and hold the products but was not permitted to use them or to determine how they functioned. The expert then asked the consumer whether any of the products were "so similar or such a satisfactory match" that he or she would buy one as a substitute for the other. See Jeffrey Stitt Aff. II ¶¶ 15, 20, 24; Insty*Bit App. at 394-96.

the packages, the district court found that the conspicuous placement of the "Snappy" letters on Poly-Tech's products made it highly unlikely that the average consumers would buy Snappy brand products mistakenly thinking that they were manufactured by Insty*Bit. See id. at 14-15. Therefore, finding no genuine issue of material fact regarding the third prong of the § 1125 analysis, the district court held that Poly-Tech was entitled to summary judgment on Insty*Bit's Lanham Act claim. Id. at 15.

For reversal, Insty*Bit argues that the district court erred in granting summary judgment in favor of Poly-Tech on its Lanham Act claim in three respects. First, Insty*Bit maintains that the district court's failure to apply the six Co-Rect factors constitutes error as a matter of law. Noting our observation in Squirtco v. The Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980), that resolution of the likelihood of confusion issue "does not hinge on a single factor but requires a consideration of numerous factors to determine whether under all the circumstances there is a likelihood of confusion," Insty*Bit contends the district court erred in relying exclusively on its own inspection of the Snappy and Insty*Bit packages, rather than applying the six Co-Rect factors for determining the existence of a likelihood of confusion under 15 U.S.C. § 1125.

Second, Insty*Bit argues that the district court's exclusive reliance on the packaging of Insty*Bit and Poly-Tech's quick-change drill products was also misplaced because such packaging designs are relevant only to the issue of point-of-sale confusion. Arguing that the Lanham Act prohibits post-sale as well as point-of-sale confusion, e.g., Computer Care v. Service Sys. Enterprises, Inc., 982 F.2d 1063, 1070 (7th Cir. 1992), Insty*Bit maintains that there is a genuine factual issue concerning the likelihood of post-sale confusion, because prospective purchasers are often first exposed to its products in the hands of another individual after the packaging has been discarded; such purchasers, Insty*Bit argues,

"typically go the store looking for a product they have seen before and try to look 'past' the packaging to match the product with the one they are seeking." Brief for Appellant at 26-27. According to Insty*Bit, the strong similarity in the appearance of the unpackaged Insty*Bit and Poly-Tech product creates a genuine issue of material fact as to whether consumers would likely be confused as to the source of the Snappy brand products to preclude entry of summary judgment in favor of Poly-Tech.

Finally, Insty*Bit challenges the district court's determination that the consumer survey had no probative value concerning the likelihood of confusion. Reiterating its argument that consumers are frequently exposed to quick-change products in unpackaged form, Insty*Bit contends that the survey expert's conclusion -- that a statistically significant number of respondents would buy the Snappy line of quick-change products as a satisfactory match to Insty*Bit's -- demonstrates a genuine issue of material fact as to whether consumers would likely be confused as to the origins of the Snappy brand products.

Poly-Tech responds, first, that although the district court did not recite each of the six Co-Rect factors in its memorandum and order, it considered all the factors in reaching its conclusion that "there is no confusion to the source of the Snappy brand products, . . .[and] [n]o evidence suggests that Snappy has confused consumers into thinking its components were made by Insty*Bit." Slip op. at 11-12. Second, addressing Insty*Bit's argument that the district court improperly placed exclusive reliance on its own inspection of the packaging of the respective products, Poly-Tech cites Woodsmith, 904 F.2d at 1250, for the proposition that a district court may visually review documentary evidence in determining whether there is a likelihood of confusion in a trade dress infringement action. Similarly, Poly-Tech argues that its prominent trade name labeling on both the Snappy packages

and actual products precludes a finding that there is a genuine issue of material fact regarding the likelihood of confusion.

Finally, Poly-Tech contends that the district court did not err in disregarding the results of the consumer survey submitted by Insty*Bit. According to Poly-Tech, the survey was flawed because, among other reasons, (1) it did not adequately define the sample of respondents; (2) it exposed respondents to the unpackaged products; and (3) it asked biased, irrelevant questions. Brief for Appellee at 30. Thus, Poly-Tech argues that the district court correctly found that the survey had no probative value with respect to the likelihood of consumer confusion. In sum, Poly-Tech argues that the district court did not err in entering summary judgment in its favor on Insty*Bit's trade dress infringement claim. We disagree.

We hold that the district court erred as a matter of law in failing to apply the six <u>Co-Rect</u> factors to determine the likelihood of consumer confusion. Contrary to Poly-Tech's argument, it is not clear from the district court's memorandum and order that it analyzed all the <u>Co-Rect</u> factors in concluding that there was no genuine issue of material fact regarding the likelihood of confusion.

We further hold that the district court erred in placing primary, if not exclusive, weight on its visual examination of the packaging of the Snappy and Insty*Bit products. Regarding this issue, Poly-Tech's reliance on <u>Woodsmith</u> is misplaced. In <u>Woodsmith</u>, we affirmed a district court's grant of summary judgment in favor of a defendant magazine publisher in a trade dress infringement action brought under section 43(a) of the Lanham Act. <u>See</u> 904 F.2d at 1250. The district court had found that no genuine issue of material fact existed regarding the likelihood of confusion. In upholding this determination, we examined the photographs and original facsimiles of the magazines and solicitation mailings published by each party. <u>See</u> <u>id.</u> at 1249-50.

We declared that "[v]isual inspection is permissible as an aid to a district court's determination of likelihood of confusion, but should not constitute the sole basis for the conclusions made." Id. at 1250. Thus, visual inspection may not replace an application of the Co-Rect factors in determining whether a likelihood of confusion exists.

Upon careful de novo review, we hold that Insty*Bit has presented sufficient evidence of the likelihood of confusion to withstand Poly-Tech's motion for summary judgment. As noted above, the following six factors must be considered in determining whether a likelihood of confusion exists: (1) the strength of the owner's mark; (2) the similarity between the owner's trade dress and the alleged infringer's trade dress; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the trade dress owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase. See Co-Rect, 780 F.2d at 1330. We consider each factor in turn, noting that although no one factor is determinative, each must be analyzed. See Duluth News-Tribune v. Mesabi Publishing Co., 84 F.3d 1093, 1096 (8th Cir. 1994) (Duluth) ("[t]hese factors do not operate in a mathematically precise formula; rather, we use them at the summary judgment stage as a guide to determine whether a reasonable jury could find a likelihood of confusion").

First, Insty*Bit has demonstrated the strength of its trade dress. Insty*Bit's quick-change drill products have received favorable reviews from several woodworking magazines and nationally televised home-improvement programs. See Insty*Bit App. at 112, 115-120. In addition, Insty*Bit's consumer survey showed that over thirty-eight percent of the respondents were familiar with Insty*Bit. See id. at 388.

Second, Insty*Bit showed there are similarities in trade dress between the Insty*Bit and Snappy quick-change products. Poly-Tech contends that its Snappy brand shank does not resemble the shank of Insty*Bit's quick-change chuck, because the Snappy chuck does not have the same prominent enlarged collar portion as Insty*Bit's. In addition, although it concedes that its Snappy line of quick-change products are black (the same color as Insty*Bit's), Poly-Tech alleges that the similarity is due to functionality because Snappy brand products are treated with black oxide in order to prevent rusting, "as all the other competitive quick-release chucks also are." Brief for Appellee at 24. Insty*Bit, however, has presented evidence that the quick-change products of competing manufacturers have coatings other than black oxide which also provide a rust-inhibiting benefit. See Insty*Bit App. at 399-400. Moreover, Insty*Bit has demonstrated sufficient similarity in the shape and design of the Snappy and Insty*Bit quick-change drill products -- such as the combination of a raised knurled band, a recessed smooth band, and another raised knurled band on the quick-change chucks -- to create a genuine issue of material fact as to whether the second Co-Rect factor has been satisfied.

As to the degree to which the products compete with each other, we note that both parties agree that their products are sold through similar distribution means. See Brief for Appellant at 24; Brief for Appellee at 25. The target purchasers are the same for both sets of products, and the products are comparably priced. See Insty*Bit App. at 65.1-66.1; 113. Thus, the competition between the Insty*Bit and Snappy products is not beyond genuine dispute.

The fourth Co-Rect factor concerns the alleged infringer's intent to "pass off" its goods as those of the plaintiff. Co-Rect, 780 F.2d at 1330. Evidence submitted by Insty*Bit showed that when Poly-Tech began marketing its Snappy line of quick-change products, it solicited the same customers and distributors to whom it had previously sold Insty*Bit's products. See Insty*Bit App. at 87-90.

-15-

We also observe that the inference of intent is strengthened when the parties have had a prior relationship, because "[s]uch a relationship provides evidence of the alleged infringer's intent to trade on the plaintiff's goodwill." Beer Nuts, Inc. v. Clover Club Foods Co., 805 F.2d 920, 927 (10th Cir. 1986). In the present case, Poly-Tech sold Insty*Bit's products through woodworking trade shows and magazine advertisements between 1989 and 1994. See Insty*Bit App. at 158; I Poly-Tech App. at 107. This fact creates a genuine issue of material fact regarding the fourth Co-Rect factor, particularly when it is combined with evidence in the record contradicting Poly-Tech's suggestion that it could not have changed certain features affecting the external appearance of its quick-change products to differentiate them more markedly from Insty*Bit's.

With respect to the fifth Co-Rect factor -- incidents of actual confusion -- we find that the consumer survey presented by Insty*Bit is probative on this issue. In Woodsmith, 904 F.2d at 1249, we stated that surveys may provide useful evidence of the likelihood of confusion, although they are not required for such a determination. See id. Insty*Bit's survey was designed, conducted, and interpreted by an experienced market researcher. The expert's conclusion that "a statistically significant number of consumers would purchase Snappy as a satisfactory match for Insty*Bit" raises a genuine issue of material fact regarding the likelihood of confusion. Although the district court found the survey flawed because the expert did not ask consumers whether they would likely purchase Snappy's products mistakenly thinking they were manufactured by Insty*Bit, such a question was not necessary to the methodological soundness of the survey. To the contrary, it is well-settled that a finding of trade dress infringement does not require consumers to buy the alleged infringer's products thinking that they were manufactured by the plaintiff; rather, all that is necessary is that they purchase the alleged infringer's products after associating the trade dress of those products with the trade

dress of a single, albeit anonymous source. See, e.g., Tone Bros., Inc. v. Sysco Corp., 28 F.3d 1192, 1204 (Fed Cir. 1994) (Tone Bros.) (plaintiff spice manufacturer in trade dress infringement action had raised genuine issue of material fact as to whether there was association in mind of consumer between container's shape and appearance and indication of the source for the spices inside the container, thereby precluding summary judgment in favor of defendant). In addition, we note that most of Poly-Tech's arguments concerning the flaws in the survey (e.g., the definition of the sample and the form of questions asked) do not render the issue of actual confusion beyond genuine dispute, rather, they go to the weight the trier of fact should place on the survey's results.

Furthermore, the portion of the survey exposing consumers to the unpackaged Snappy and Insty*Bit quick-change systems is probative on the likelihood of confusion issue, because the Lanham Act protects post-sale as well as point-of-sale confusion. See Payless Shoesource, Inc v. Reebok Int'l Ltd., 998 F.2d 985, 989-90 (Fed. Cir. 1993) (Payless); Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d 215, 222 (1st Cir. 1989); Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 872 (2d Cir. 1986) (Lois Sportswear). "Post-sale confusion" refers to the association consumers might make between the allegedly infringing item and the familiar product, thereby influencing their purchasing decisions. Lois Sportswear, 799 F.2d at 872-73. The Lanham Act's protection of post-sale confusion stems from the 1962 amendment to § 32 of the Act, 15 U.S.C. § 1114(1), which provides remedies for the infringement of registered trademark. Pub. L. No. 87-772, 76 Stat. 769, 773 (1962). The 1962 amendment included confusion of nonpurchasers as well as direct purchasers by eliminating language in § 32 which had restricted the scope of trademark infringement to confusion of "purchasers as to the source of origin of such goods or services." 76 Stat. at 773. Thus, an action for trademark infringement may be based on confusion of consumers other than

direct purchasers, including observers of an allegedly infringing product in use by a direct purchaser. See Payless, 998 F.2d at 989; Lois Sportswear, 799 F.2d at 872-73. Although § 32 of the Lanham Act protects registered trademarks, rather than trade dress, the Supreme Court's holding in Two Pesos, 505 U.S. at 774-76, that the same analyses apply to the protection of trademarks and trade dress under § 43(a) of the Act leads us to conclude that the likelihood of post-sale confusion may be considered in trade dress infringement actions. See Payless, 998 F.2d at 989-90 (holding that district court, in determining whether accused shoes infringed footwear manufacturer's trademarks and trade dress, had abused its discretion in failing to consider adequately the extent of post-sale confusion between the competing footwear). Post-sale confusion is at issue in the present case because Insty*Bit has demonstrated that consumers are often first exposed to its products in use (that is, outside of the package) and then go to a distributor to find these tools by attempting to match the products on the shelves with the ones they are seeking. See Jeffrey Stitt Aff. ¶17; Insty*Bit App. at 394-95. We therefore find a genuine issue of material fact as to actual confusion.

The final Co-Rect factor for assessing the likelihood of confusion is the type of product, its costs, and conditions of purchase. Co-Rect, 780 F.2d at 1330. Although Poly-Tech does not address this factor in its brief, Insty*Bit alleges that the quick-change drill products are inexpensive and are not the type of products over which consumers devote substantial time in making purchasing decision. Such factors, if found to be true by the trier of fact, would weigh in favor of a conclusion that a likelihood of confusion exists.

In sum, our application of the Co-Rect factors to the present case leads us to conclude that the likelihood of consumer confusion is not beyond genuine dispute.

Poly-Tech also argues, however, that it is entitled to summary judgment because Insty*Bit failed to demonstrate a genuine issue of material fact with respect to the other two elements of a trade dress infringement claim under 15 U.S.C. § 1125. Specifically, Poly-Tech contends that Insty*Bit's trade dress is not entitled to protection under § 1125 because (1) it is not inherently distinctive and has not acquired distinctiveness through secondary meaning and (2) it is merely functional, rather than non-functional.[9] As discussed below, we find that a genuine issue of material fact exists as to each of these elements.

In determining whether a trade dress or trademark is sufficiently distinctive to be entitled to protection under the Lanham Act, we have classified it as (1) arbitrary or fanciful,[10] (2) suggestive,[11] (3) descriptive,[12] or (4) generic.[13] Duluth, 84 F.3d at 1096; Stuart Hall Co. v. Ampad Corp., 51 F.3d 780, 785 (8th Cir. 1995)(Stuart Hall); Abercrombie & Fitch Co. v. Hunting World,

---

[9]The district court did not address these issues in its Memorandum and Order granting summary judgment in favor of Poly-Tech.

[10]The Second Circuit explained in Abercrombie that the term "fanciful," as a classifying concept, is usually applied to marks invented solely for their use as trademarks or trade dress. See Abercrombie, 537 F.2d at 11 n.12. When a common mark is applied in an unfamiliar way as a trademark or trade dress, the use is called "arbitrary." Id.

[11]A suggestive mark is "one that requires some measure of imagination to reach a conclusion regarding the nature of the product." Duluth, 84 F.3d at 1096.

[12]A descriptive trademark or trade dress "immediately conveys the nature or function of a product." Id.

[13]A generic trademark or trade dress "refer[s] to the genus of which the particular product is a species." Two Pesos, 505 U.S. at 768.

<u>Inc.</u>, 537 F.2d 4, 9-11 (2d Cir. 1976) (<u>Abercrombie</u>).  An arbitrary, fanciful, or suggestive mark is deemed inherently distinctive, and

therefore entitled to protection, because its "intrinsic nature serves to identify a particular source of a product." Two Pesos, 505 U.S. at 768. By contrast, a descriptive mark merits protection only if it has become distinctive by acquiring a secondary meaning.[14] Duluth, 84 F.3d at 1096. Finally, a generic term is not protected by the Lanham Act, because it is merely used by the general public to identify a category of goods. Id. Thus, a determination of inherent distinctiveness turns on "whether or not the trade dress is of such a design that a buyer will immediately rely on it to differentiate the product from those of competing manufacturers." Tone Bros., 28 F.3d at 1206.

Viewing the evidence in a light most favorable to Insty*Bit, a genuine issue of material fact exists as to both inherent distinctiveness and secondary meaning. First, Insty*Bit has submitted the declarations of a retailer, two sales representatives, and a private label distributor that the design of Insty*Bit's products was unique when introduced. See Insty*Bit App. at 111, 241, 246, 248. Such evidence creates a genuine issue of material fact concerning the inherent distinctiveness of Insty*Bit's trade dress because a reasonable trier of fact could find that the trade dress is arbitrary, fanciful, or suggestive. Similarly, whether the trade dress has acquired secondary meaning is not beyond genuine dispute, in light of evidence that (1) Insty*Bit's products have a six-year record of advertising and promotion in the marketplace and (2) consumers associate the appearance of Insty*Bit's products with a particular manufacturer. Id. at 111-12, 156, 241, 246.

---

[14]A trademark or trade dress has acquired secondary meaning if it has "by long and exclusive use and advertising . . . become so associated in the public mind with such goods . . . that it serves to identify them and distinguish them from other goods." Stuart Hall, 51 F.3d at 789.

Finally, Poly-Tech contends that it is entitled to summary judgment because the design features of Insty*Bit's quick-change products are functional and therefore not entitled to trade dress protection.  We have adopted the following test for functionality:

> If the particular feature is an important ingredient in the commercial success of the product, the interests in free competition permits [sic] its imitation in the absence of a patent or copyright.  On the other hand, where the feature, or more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality, and hence, unrelated to basic consumer demand in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made.  Under such circumstances, since effective competition may be undertaken without imitation, the law grants protection.

Stuart Hall, 51 F.3d at 790 (quoting Aromatique, 28 F.3d at 873).  Thus, trade dress is nonfunctional "if it is an arbitrary embellishment primarily adopted for purposes of identification and individuality."  Aromatique, 28 F.3d at 873.  In assessing functionality, the appropriate inquiry is whether the collection of design elements, taken as a whole, are functional, not whether individual elements of the trade dress could be categorized as such.  See Hartford House, Ltd. v. Hallmark Cards, Inc., 846 F.2d 1268, 1272 (10th Cir.) (Hartford House), cert. denied, 488 U.S. 908 (1988); Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 842 (9th Cir. 1987).  In the present case, we find a genuine issue of material fact exists regarding the functionality issue.  Although Poly-Tech argues that the exterior design of Insty*Bit's quick-change products -- including the color black and the

appearance of the sleeve and shank -- are primarily functional because they remain necessary to the commercial success of these products, Insty*Bit has presented evidence that competing manufacturers have adopted different design features for their

quick-change products.  <u>See</u> Insty*Bit App. at 23-24, 162-666; 244-45.  Thus, a genuine issues of material fact exists as to whether or not the design of Insty*Bit's quick-change products is functional.  Poly-Tech is not entitled to summary judgment on this issue.

## III.  Conclusion

Based upon the foregoing, we hold that the district court erred in granting summary judgment in favor of Poly-Tech on the basis that Insty*Bit had failed to demonstrate a genuine issue of material fact with respect to its trade dress infringement action. Accordingly, the judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.