**ASHLEY FURNITURE INDUSTRIES, INC., a Wisconsin corporation, Plaintiff,**

v.

**SANGIACOMO N.A. LTD., a New Jersey corporation; and Carlo Bargaglistoffi, Defendants.**

**No. Civ.A. 2:97CV00309.**

United States District Court, M.D. North Carolina, Greensboro Division.

July 22, 1998.

James A. Medford, Smith, Helms, Mulliss & Moore, Greensboro, NC, Larissa, Jones, Erkman, Smith Helms, Mulliss & Moore, Greensboro, NC, John J. Held, D. David Hill, McAndrews, Held & Malloy, Ltd., Chicago, IL, Thomas J. Wimbiscus, McAndrews, Held & Malloy, Ltd., Chicago, IL, Anthony E. Dowell, McAndrews, Held & Malloy, Ltd., Chicago, IL, for Plaintiff.

Charles Robert Rhodes, Gilbert J. Andia, Jr., Rhodes, Coats & Bennett, L.L.P., Greensboro, NC, James Lee Lester, Rhodes, Coats & Bennett, L.L.P., Greensboro, NC, Jerrold J. Wohlgemuth, Reppert Kelly & Wohlgemuth, Westfield, NJ, for Defendants.

## MEMORANDUM OPINION

BULLOCK, Chief Judge.

This case presents a dispute between two competitors in the bedroom furniture market. The dispute concerns whether or not the bedroom furniture produced by one manufacturer infringes upon the rights which another may have in its furniture design. The case is presently before the court on cross motions for summary judgment and a motion to dismiss the claim against the individual Defendant. For the reasons that follow, the court will grant the corporate Defendant's motion for partial summary judgment, deny Plaintiff's motion for partial summary judgment, and grant the motion to dismiss.

### BACKGROUND

The following facts are established from the pleadings, depositions, declarations, affidavits, and exhibits filed by the parties.

Plaintiff Ashley Furniture Industries, Inc. ("Ashley") and Defendant SanGiacomo, N.A., Ltd. ("SanGiacomo") are manufacturers of home furniture. Ashley, located in Wisconsin, produces thirty different bedroom suites. Its Millennium division produces leather upholstery, occasional furniture, and approximately fifteen bedroom suites. SanGiacomo specializes in the design, manufacture, and importation of Italian bedroom and living room furniture.[1] Ashley and SanGiacomo market and sell their furniture on a nationwide basis. Defendant Carlo Bargagli–Stoffi ("Bargagli") is the chief executive officer of SanGiacomo.

The parties are not strangers to this court. In previous litigation before this court, Ashley accused SanGiacomo of infringing a design patent and SanGiacomo counterclaimed that Ashley was infringing the trade dress of one of its bedroom suites. On September 14, 1994, the parties settled these claims during a one-on-one, closed-door negotiation between Bargagli and Ronald Wanek, the chairman and CEO of Ashley. Wanek and Bargagli agreed that both sides would walk away from the suit, and that neither company would, in the future, copy the other's furniture designs.[2] Although the parties then entered into a written settlement agreement drawn up by counsel, the settlement agreement contains no reference to any mutual covenant not to copy.

Approximately one year after settlement of the previous litigation, in the fall of 1995, Ashley's Millennium Division introduced at the High Point Furniture Market a neoclassical bedroom suite under the trade name "Sommerset." The suite consisted of a headboard, two nightstands, a dresser with a mirror, and an armoire. The Sommerset design combined modern elements such as a high-gloss polyester finish with classical details such as fluted columns, arches, and entablatures. Retail sales of the Sommerset suite began in March of 1996.

In December 1996 or January 1997, SanGiacomo began selling a line of bedroom furniture under the name "La Dolce Vita." The items in this suite also consisted of a headboard, two nightstands, a dresser and mirror, and an armoire. Like the Sommerset, SanGiacomo's design included a high-gloss finish, fluted columns, arches, and entablatures. Although the entire Sommerset collection retails for approximately $2,500.00, the La Dolce Vita suite retails for approximately $1,800.00. Sales of SanGiacomo's bedroom furniture displaced sales of the Sommerset at many retailers, who had offered or agreed to purchase the Sommerset for resale. Claiming that SanGiacomo's design infringed Ashley's trade dress in its Sommerset design, Ashley filed suit alleging trade dress infringement under the Lanham Act, common law unfair competition, and violation of the North Carolina Deceptive Trade Practices Act, N.C.Gen.Stat. § 75–16. Ashley subsequently amended its complaint to add claims of tortious interference with prospective business advantage and breach of contract against SanGiacomo and a claim that Bargagli tortiously interfered with the contract between SanGiacomo and Ashley not to copy each other's designs.

After close of discovery, Ashley moved for summary judgment on its breach of contract claim and on the issue of whether SanGiacomo copied the Sommerset design. SanGiacomo in turn moved for summary judgment on Ashley's trade dress claim under the Lanham Act. Bargagli has also moved to dismiss the tortious interference count against him for failure to state a claim.

## DISCUSSION

Summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). At the summary judgment stage, a court may also rule on specific issues with respect to a portion of a claim that are not reasonably in dispute. *See* Fed.R.Civ.P. 56(d); *Gadsden v. Fripp*, 330 F.2d 545, 547 (4th Cir.1964). The moving party bears the burden of persuasion on the relevant issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91

---

**1.** SanGiacomo is now doing business under the name "Sangiorgio Furniture Industries, Inc."

**2.** Bargagli states that the parties made a "gentlemen's agreement" that they would not make any "Polaroid copies" of the other's designs. (Bargagli Decl. ¶ 2).

L.Ed.2d 265 (1986). The party opposing summary judgment cannot simply rest upon its pleadings but must come forward with specific evidence "from which a jury might return a verdict in [its] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the motion is supported by affidavits, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). In considering the evidence, all reasonable inferences will be drawn in favor of the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Nevertheless, a mere scintilla of evidence is insufficient to defeat a motion for summary judgment. *Id.* at 252, 106 S.Ct. 2505.

## I. Trade Dress Claim

■ The purpose of trademark and trade dress law as it has developed under the Lanham Act, 15 U.S.C. § 1125(a), is to aid consumers in identifying the source of goods by allowing producers the exclusive right to particular identifying words, symbols, packaging or dress which accompany their products as a designator of source. *See Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co., Inc.*, 916 F.2d 76, 78–79 (2d Cir. 1990), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 720 (1991). Allowing a particular producer to monopolize in this way a particular symbol, mark or packaging design imposes no undue burden on competition. First, the universe of product symbols, marks, and packaging is limited only by the bounds of human imagination. Second, the only value of an arbitrary symbol or product container usually derives from its association with the producer's products and the good will which consumers may feel toward that producer because of the quality of his products. *See Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 657 (7th Cir.1995). Because the symbol or container itself generally adds nothing to the value of the product, consumers desire products marketed with that symbol or in that container only because they believe that the products originated with the producer for whom the consumer bears the good will. Accordingly, the only reason a competitor would seek to copy a mark or product packaging would be to pass off his product as that of the original producer. *See id.*

■ Although "trade dress" traditionally referred to the packaging and labeling of a product, courts over the years have stretched the term to include the shape and design of the product itself. Trade dress protection in the configuration of the product itself, however, presents a unique set of problems. Trade dress protection should apply to product features only insofar as they denote the product's source. *See Restatement (Third) Unfair Competition* § 16, cmt. b ("The imitation or even complete duplication of another's product or packaging will not create a risk of confusion unless some aspect of the duplicated appearance is identified with a particular source."). While a product's features may serve primarily to signify its source, these features are still part of the product itself and may be valued by consumers as such. When competitors are barred from reproducing product features whose value to consumers is intrinsic and not simply as a signifier of source, competition suffers. *See also id.* § 16, cmt. b:

> As a practical matter, ... it is less common for consumers to recognize the design of a product or product feature [as opposed to packaging features] as an indication of source. Product designs are more likely to be seen merely as utilitarian or ornamental aspects of the goods. In addition, the competitive interest in copying product designs is more substantial than in the case of packaging, containers, labels, and related subject matter. Product designs are therefore not ordinarily considered inherently distinctive and are thus normally protected only upon proof of secondary meaning.

Those who seek exclusivity through trade dress protection in product shapes or designs, therefore, must make a clear showing of validity and infringement. 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:1 at 8–4 (4th ed. 1997) ("McCarthy"). The general trend among courts in recent years has been to make it considerably more difficult to assert trade dress protection in product shapes. *See id.* § 8:5 at 8–13 n. 3 (collecting cases).

█ In considering a claim of trade dress infringement, a court must look at the total image or overall impression of Plaintiff's products. In so doing, the court must identify the discrete elements that make up the total trade dress so that the litigants and the public will know the exact parameters of the claimed exclusive right. *See id.* § 8:3 at 8–6; *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir.1997). Plaintiff states that its Sommerset trade dress consists of the total image of the furniture group, "including the entire configuration, design, shape, coloring, size and/or texture and each separate component feature of the furniture group." (Pl.'s Resp. to Defs.' First Set of Interrog. No. 3). The Sommerset suite's neoclassical design consists of a marbleized high-gloss polyester finish in two shades of brownish-beige, stylized off-white mouldings on the nightstands, dresser, and armoire, classic fluted columns on the headboard and mirror, and arched tops on the mirror and headboard frames. The result, claims Ashley, is the unique combination of a "high-tech" look and feel with classic architectural elements.

█ In order to make out a claim for infringement of this trade dress under Section 43(a) of the Lanham Act, Ashley must show (1) that its product's shape is recognized by customers to identify and distinguish its source; (2) that the shape is not dictated by utilitarian concerns; and (3) that the similarity of Defendants' product design to Ashley's design will confuse customers as to the source, sponsorship, connection with or approval of Defendants' product. *See* McCarthy § 7:54 at 7–106 to 7–107. A plaintiff may demonstrate in one of two ways that customers recognize its product's shape or design to identify and distinguish its source: with proof that the plaintiff's product design (1) is inherently distinctive; or (2) has acquired secondary meaning. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Tools USA and Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 657 (4th Cir.1996). Because Ashley has failed to produce evidence sufficient to create a genuine issue as to either of these two alternatives, it has failed to demonstrate that it has a protectable trade dress. SanGiacomo is thus entitled to judgment as a matter of law on Ashley's trade dress claim under the Lanham Act.

### A. Inherent Distinctiveness

Ashley argues that in the market for bedroom furniture the shopping process requires consumers to rely upon the appearance of furniture in order to comparison shop. When a furniture design is so unique and unusual, Ashley continues, a consumer upon seeing a similar design may think that it is a product of the same source. Ashley argues that, because its design is unique and memorable, it is "capable of identifying ... [its] source," *Two Pesos*, 505 U.S. at 771, 112 S.Ct. 2753, and it is therefore inherently distinctive.

The court cannot agree. If a product design need only be unique to be inherently distinctive, then any design that can be said to differ from others in the relevant market would qualify for exclusive trade dress protection. *See Sunburst Prods., Inc. v. Cyrk Int'l*, 98 F.3d 1358, 40 U.S.P.Q.2d 1939, 1943 (Fed.Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1468, 137 L.Ed.2d 682 (1997). Such a low standard for inherent distinctiveness would allow the law of unfair competition to swallow the carefully designed schemes for patent and copyright protection.

It is much easier to reject Ashley's definition of inherently distinct product designs than it is to provide the correct definition because the law defining inherently distinct product configurations is presently in flux. For purposes of trademark law, marks or product features traditionally have been arranged into five categories: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *Two Pesos*, 505 U.S. at 768, 112 S.Ct. 2753 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976)). The latter three categories in what is now known as the "*Abercrombie* taxonomy" are considered inherently distinctive "because their intrinsic nature serves to identify a particular source of a product." *Id.* The essence of an inherently distinctive mark is its capacity to distinguish a product and identify its source. *See Sunbeam Prods., Inc. v. West Bend Co.*, 123 F.3d 246,

252 (5th Cir.1997) ("The gravamen of trademark law is source identification."), *cert. denied*, —— U.S. ——, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998).

Difficulties have arisen, however, when courts have attempted to apply this taxonomy to product configuration. While packaging in some circumstances may be suggestive or otherwise inherently inform the customer of the source of the product contained within it, the design of a product may not be suggestive of the product or its source at all—in many instances the design is fundamentally the product itself. Putting the label "arbitrary" or "fanciful" on the design does not assist the court in focusing the analysis on the concern of the Lanham Act—confusion as to source or sponsorship. Product design can be "arbitrary" or "fanciful" as those terms are commonly used without conveying or having the capacity to convey any information to the consumer concerning the source of the goods. Courts and commentators have recognized that absent such a source-identifying function, Lanham Act protection for "arbitrary" or "fanciful" product configurations risks affording protection for unique designs in circumstances in which there is no justification for providing protection beyond that afforded by patent or copyright law. *See Mulberry Thai Silks, Inc. v. K & K Neckwear, Inc.*, 897 F.Supp. 789, 793 (S.D.N.Y.1995); *Restatement (Third) Unfair Competition* § 16, cmt. b ("Rigorous application of the requirement[ ] of distinctiveness ... is necessary in order to avoid undermining the carefully circumscribed statutory regimes for the protection of useful and ornamental designs under federal patent and copyright law.").

The Third Circuit was the first to draw the distinction between product design and product packaging in formulating a definition of inherent distinctiveness.

> The difficulty is that ... a product configuration differs fundamentally from a product's trademark, insofar as it is not a symbol according to which one can relate the signifier (the trademark, or perhaps the packaging) to the signified (the product). Being constitutive of the product itself and thus having no such dialectical relationship to the product, the product's configuration cannot be said to be 'suggestive' or 'descriptive' of the product, or 'arbitrary' or 'fanciful' in relation to it. The very basis for the trademark taxonomy—the descriptive relationship between the mark and the product, along with the degree to which the mark describes the product—is unsuited for application to the product itself. ... [O]ne cannot automatically conclude from a product feature or configuration—as one can from a product's arbitrary name, for example—that, to a consumer, it functions primarily to denote the product's source.

*Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1440–41 (3d Cir.1994) (citations omitted). An arbitrary or fanciful mark or dress is presumed, as a matter of law, to achieve consumer recognition immediately upon its adoption and use, because the primary function of the mark or dress is the source of identification. In contrast, a product configuration cannot generally warrant a presumption of identification, "as consumers usually appreciate a product's configuration for its contribution to the inherent appeal of the product, not (in the absence of secondary meaning) its signifying function." *Id.* at 1441.

The Third Circuit distinguished *Two Pesos* by noting the Supreme Court specifically stated that the sole issue before it in that case was whether secondary meaning must be proven for an inherently distinctive trade dress and thus the applicability of the *Abercrombie* taxonomy to trade dress was not at issue. The Third Circuit also reasoned that the subject matter of the suit in *Two Pesos* —a restaurant's decor—was more akin to product packaging than product configuration. *Id.* at 1442.

The Third Circuit therefore developed a new test for inherently distinctive product configuration.

> [T]o be inherently distinctive, a product configuration—comprising a product feature or some particular combination or arrangement of product features—for which Lanham Act protection is sought must be (i) unusual and memorable; (ii) conceptually separable from the product; and (iii) likely

to serve primarily as a designator of origin of the product. *Id.* at 1448–49.

The Second Circuit followed suit in *Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996 (2d Cir.1995), concluding that the *Abercrombie* taxonomy was not appropriate where the trade dress at issue consists of a product's features rather than a product's packaging.

> Not only does the classification of marks into 'generic,' 'descriptive,' 'suggestive,' or 'arbitrary or fanciful' make little sense when applied to product features, but it would have the unwelcome, and likely unintended, result of treating a class of product features as 'inherently distinctive,' and thus eligible for trade dress protection, even though they were never intended to serve a source-identifying function.

71 F.3d at 1007. The Second Circuit, however, declined to adopt the Third Circuit's *Duraco Products* test for inherent distinctiveness, which it considered wholly new. The Second Circuit instead asked whether the product's design was likely to be understood as an indicator of the product source. 71 F.3d at 1008. Although the Second Circuit indicated in *Knitwaves* that a manufacturer's subjective intentions may be probative of whether its dress is likely to indicate product source, *see id.* at 1008–09, that circuit has since moved away from this position and declared that "objective consideration of the product and its similarity to others on the market will always be relevant and often decisive." *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 378 n. 3 (2d Cir.1997).

Insofar as the Second Circuit's definition of inherently distinctive product designs focuses the inquiry on a comparison of a plaintiff's design to others in the market, this test comports with the venerable *Seabrook* formula for inherently distinctive trade dress. The *Seabrook* test focuses on a comparison of the plaintiff's trade dress to others in the same class of goods and asks whether the dress is

> a 'common' basic shape or design, whether it [is] unique or unusual in a particular field, [or] whether it [is] a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular

class of goods viewed by the public as a dress or ornamentation for the goods.

*Seabrook Foods, Inc. v. Bar–Well Foods, Ltd.,* 568 F.2d 1342, 1344 (C.C.P.A.1977). McCarthy restates the *Seabrook* test as "whether the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin—a trademark." 1 McCarthy, § 8:13 at 8–29. The *Seabrook* test clarifies the importance of market context and "highlights the notion that a design cannot be considered in a vacuum." *Krueger Int'l, Inc. v. Nightingale, Inc.,* 915 F.Supp. 595, 603 (S.D.N.Y.1996).

The Eighth Circuit has led the charge against rejection of the *Abercrombie* taxonomy for product configuration cases. In *Stuart Hall Co., Inc. v. Ampad Corp.,* 51 F.3d 780 (8th Cir.1995), the Eighth Circuit reasoned that *Two Pesos* rested on the presumption that "trade dress" is a single concept that encompasses both product configuration and packaging. The court noted that the Supreme Court expressly approved the Fifth Circuit's application of the *Abercrombie* taxonomy to the claimed trade dress infringement. The Eighth Circuit rejected the *Duraco Products* test based on source identification and memorableness, and argued that requiring showings beyond that which is "inherent" essentially blurs the two ways in which trade dress may be distinctive, because such a requirement "applies not to whether a trade dress is *inherently* distinctive, but to whether it has a secondary meaning." *Id.* at 787 (emphasis added).

> A showing of secondary meaning requires empirical proof of consumer recognition and identification, but the new [*Duraco Products* ] test would amount merely to a shift from *actual* consumer recognition to *likely* consumer recognition. Thus, ... [the *Duraco Products* ] test would undermine *Two Pesos* by requiring that, in order to be inherently distinctive, a trade dress be shown to meet a version of the secondary meaning test with a lesser burden of production.

51 F.3d at 788 (emphasis in original, citation omitted). The Eighth Circuit's view is that

departure from *Abercrombie* for product-configuration plaintiffs would foreclose the possibility that "product configuration, like packaging, can be inherently distinctive," *id.*, because all plaintiffs seeking Lanham Act protection for product configuration would have to make additional showings.

Although the Fourth Circuit did cite to the *Abercrombie* taxonomy in two trademark cases and in an unpublished disposition regarding product designs, *see Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124–25 (4th Cir.1990); *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir.1984); and *Devan Designs, Inc. v. Palliser Furniture Corp.*, 998 F.2d 1008 (4th Cir.1993) (unpublished decision), it has not clearly ruled on the appropriate test for inherently distinctive product designs. This court need not, however, choose from among the Second, Third, and Eighth Circuit approaches. Each of these tests, applied with the knowledge that the essential purpose of the Lanham Act is to protect consumers against the risk of confusion as to source, sponsorship or affiliation, *see* 15 U.S.C. § 1125(a), leads to the conclusion that Ashley's Sommerset design is not inherently distinctive.

■ Ashley's evidence that the Sommerset suite is inherently distinctive is thin. First, Ashley produces the declaration of its industry expert, Howard Herzog, stating that in his opinion the Sommerset suite is unique and unlike anything he has seen. Herzog also states that the particular design features brought together in the Sommerset suite have never before been utilized together. Finally, Wanek testified that Ashley had intended to create a unique and distinctive design in creating the Sommerset suite.

No reasonable jury applying the *Abercrombie* taxonomy could find that Ashley's product design is inherently distinctive. The use of a high-gloss finish, columns, arches and entablatures on bedroom furniture cannot be characterized as arbitrary or fanciful because, as Ashley admits, such features are common to the furniture industry. *Cf. Abercrombie*, 537 F.2d at 11 n. 12 ("[T]he term 'fanciful,' as a classifying concept, is usually applied to words invented solely for their use as trademarks. When the same legal consequences attach to a common word, *i.e.*, when it is applied in an unfamiliar way, the use is

called 'arbitrary.'"). Nor can one conclude that Ashley's design is "suggestive," because it does not "require[ ] imagination, thought [or] perception to reach a conclusion as to the nature of the goods." *Id.* at 11 (internal quotation marks omitted). The only category which reasonably fits Ashley's trade dress is "descriptive." Trade dress is descriptive "if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* (internal quotation marks omitted). Such is the case here. The Sommerset design is merely descriptive of itself and, as such, is not inherently distinctive. The fact that no prior bedroom suite had combined these particular design elements is simply not probative of whether or not Ashley's design is "likely to differentiate the products of . . . [its] producer." *See Mulberry Thai*, 897 F.Supp. at 797 (internal quotation marks omitted).

Similarly, no reasonable jury applying the Third Circuit's *Duraco Products* test could conclude that the Sommerset suite is inherently distinctive. The Third Circuit's approach to inherent distinctiveness requires that a product design be (1) unusual and memorable; (2) conceptually separable from the product; and (3) likely to serve primarily as a designator of origin of the product. *Duraco Products*, 40 F.3d at 1448–49. The second prong of this test requires that the product configuration be recognizable by the consumer as an indicator of source, rather than as a decorative symbol or pattern or mere component of the good. *Id.* at 1449–50.

Ashley has no evidence with which to link the unique or unusual features of its Sommerset design with customers' tendency to identify Ashley as the source of this furniture. Ashley has presented no evidence that consumers would recognize Sommerset's neoclassical design as an identification of source. Ashley does present an affidavit from Ronald Wanek stating that he had heard through a sales person that a customer had complained that he had overpaid for his Sommerset suite after seeing an advertisement for SanGiacomo's bedroom set at a lower price. Wanek also states that based on information obtained through business channels that he normally and reasonably relies upon, Ashley

customers and potential customers have been confused about the origin or source of Defendant's bedroom suite. Finally, Ashley produces an affidavit from one of its retailers stating that, based upon comments of customers that have shopped for furniture in his store, he believes that customers have been confused by the similarity in appearance of the Sommerset and the La Dolce Vita. This retailer also states that several customers have complained to him that other stores were selling the Sommerset suite at a lower price, when in fact those stores were selling Defendant's bedroom suite. Even if all of these statements were admissible evidence, they are neither representative of consumers nor probative of source identification. Ashley simply has no objective evidence that consumers considered Sommerset's design to be source-identifying. The Sommerset suite is thus not inherently distinctive under the *Duraco Products* analysis.

The Sommerset suite also falls short of inherent distinctiveness using the *Knitwaves* and *Seabrook* courts' tests. The columns, arches, and entablatures used by Ashley are clearly "common basic shape[s]." *Seabrook,* 568 F.2d at 1344 (internal quotation marks omitted). Furthermore, Ashley admits that the use of columns, arches, entablatures, and the high-gloss polyester finish is hardly unique in the furniture industry. Such commonplace shapes carry no distinctive message of origin, and could not carry such a message (absent secondary meaning) given their widespread use as "commonly-adopted ... form[s] of ornamentation" in the furniture industry. *Id.* In light of the long-standing use of these product features in the industry, their arrangement in the Sommerset suite cannot be considered inherently distinctive. *Compare Wiley v. American Greetings Corp.,* 762 F.2d 139, 141–42 (1st Cir. 1985) (upholding summary judgment against trademark protection in a red heart permanently affixed to the left breast of a teddy bear; mark was not inherently distinctive, even if the particular combination of elements was unique, in light of the common use of a heart-shaped design on stuffed animals), *with Tone Bros., Inc. v. Sysco Corp.,* 28 F.3d 1192, 1206 (Fed.Cir.1994) (genuine issue of fact existed on the issue of inherent distinctiveness where the evidence showed that the plaintiff was the first to use a transparent container in the food service channel and the first to use the container in that particular shape), *cert. denied,* 514 U.S. 1015, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995).

In sum, no reasonable jury—applying any of the analyses as set out above—could find that Ashley's Sommerset design is inherently distinctive.

### B. *Secondary Meaning*

■ A product design that is not inherently distinctive may nevertheless receive trade dress protection if it has acquired a secondary meaning. In order for trade dress to have acquired a secondary meaning, the consuming public must associate that trade dress with a certain producer and be likely to make the same association when the trade dress is used on another producer's product. The public need not be able to identify the name of the manufacturer of the product; "it is enough if the public perceives that the product emanates from a single source." *Tools USA,* 87 F.3d at 660 (quoting *M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 449 (4th Cir.1986)) (internal quotation marks omitted).

■ Ashley argues that SanGiacomo has intentionally copied its trade dress and thus the court should presume the existence of secondary meaning. Ashley misunderstands the evidence necessary to support such a presumption. A court will presume the existence of secondary meaning only when the Plaintiff has shown that the Defendant has copied its product design with the intent to cause customer confusion or to deceive the consuming public. *See Shakespeare Co. v. Silstar Corp. of America, Inc.,* 110 F.3d 234, 239 (4th Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 688, 139 L.Ed.2d 634 (1998). Ashley has no evidence to show that SanGiacomo acted with such intent. In fact, there is some evidence that SanGiacomo did not intend to confuse or deceive the public. For example, SanGiacomo's bedroom suite was advertised as imported from Italy—a fact which distinguishes it from the American-made Sommerset suite. The court cannot, therefore, simply presume the existence of secondary meaning in Ashley's Sommerset design.

Courts will typically consider four factors in determining whether a plaintiff's trade dress has acquired a secondary meaning: (1) long use; (2) advertising; (3) sales volume; and (4) identity of service or origin in the minds of the purchasing public (*i.e.,* actual confusion). *Tools USA,* 87 F.3d at 660.

In this case, Ashley enjoyed no long period of exclusive use of Sommerset's trade dress. Actual shipments of Ashley's furniture to retailers began in March 1996. San-Giacomo introduced its competing furniture in September 1996, and first sales followed in December 1996 or January 1997. A mere ten months of exclusive use of a furniture design is insufficient to create secondary meaning. *See Devan Designs, Inc. v. Palliser Furniture Corp.,* 25 U.S.P.Q.2d 1991, 1998 (M.D.N.C.1992) (holding that if a plaintiff's trade dress is alleged to consist of the overall design of its product itself, then it will usually take longer for it to acquire secondary meaning), *aff'd,* 998 F.2d 1008 (4th Cir.1993).

Second, the vast majority of advertising for Ashley's Furniture invited no connection between Ashley and its products. Almost all the advertising in the furniture industry is undertaken by retailers.[3] To create secondary meaning, advertising must promote a connection between a product feature and its source. The consumer advertising sponsored by large retailers such as Levitz and Modernage, however, did not mention Ashley or Millennium. Furthermore, Ashley has not received any unsolicited media attention with respect to the Sommerset design.[4] The retail marketing of the Sommerset suite also undercuts the development of secondary meaning. Charles Vogel, Ashley's vice-president and chief sales officer, testified that there is no typical way in which Ashley or Millennium furniture is shown on the retail floor and Ashley places no requirements or instructions upon retailers as to how to show its furniture. Although some retailers may identify the furniture with a hang tag, that practice is by no means universal. Even when hang tags are used, they may or may not identify Ashley as the manufacturer.

Third, the volume of sales of the Sommerset design in this case cannot establish secondary meaning. The court doubts whether a product's sales success is ever determinative of whether the product design has any source-designating capacity. Unlike a trademark or product packaging case, in a product configuration case strength of consumer demand is not very probative of secondary meaning because any market success may be attributable to the desirability of the product configuration itself rather than any source-designating capacity of the product's design. The very fact that a design is unusual often motivates a consumer to purchase the product, even though he does not care who its source may be. *See Duraco Products,* 40 F.3d at 1453. Furthermore, Ashley's evidence shows that, at the time SanGiacomo introduced its allegedly infringing product in December 1996 or January 1997, the Sommerset design was just beginning to achieve a modest level of sales success. Ashley's suite was introduced by retailers in March 1996. By the end of November 1996, cumulative sales reached approximately $2.5 million. Total sales reached almost $4 million by the end of January 1997. Although Ashley's sales continued on an upward trend after introduction of La Dolce Vita in December 1996 or January 1997 and eventually reached $10 million in cumulative sales in December 1997, the sales success enjoyed by Sommerset after introduction of La Dolce Vita is not probative of whether Sommerset had achieved secondary meaning prior to that introduction. The sales volume of Ashley's Sommerset is therefore insufficient to support a finding of secondary meaning.

Finally, Ashley has failed to present sufficient evidence of public association of Sommerset's trade dress with Ashley. One means by which a plaintiff could demonstrate this public association is through evidence of

---

**3.** Although Ashley took out a full page advertisement in an industry trade journal for the Sommerset design, that advertisement could not reach any significant portion of the consuming public.

**4.** Although Wanek testified at his deposition that some trade publications produced some features on the Sommerset suite, these publications are not probative of secondary meaning because they were not directed at the consuming public and there is no evidence that the public was aware of them.

actual consumer confusion. *Tools USA*, 87 F.3d at 660. In *Tools USA*, the Fourth Circuit held that the plaintiff had presented sufficient evidence of such association through two anecdotal instances of actual consumer confusion and the defendant's admission that the similarity of the parties' catalogues undoubtedly created confusion in the marketplace. *See id.* Ashley's evidence in this case falls far short of that presented in *Tools USA*. Ashley presents three items of evidence on actual consumer confusion. First, Ashley presents an affidavit from Wanek stating that he had heard through a salesperson that a customer had complained that he had overpaid for his Sommerset suite after seeing an ad for SanGiacomo's bedroom set at a lower price. Ashley must marshal admissible evidence in order to oppose San-Giacomo's motion for summary judgment. Hearsay will not suffice. Second, Wanek states in his affidavit that, "Based on information ... obtained through business channels that [he] normally and reasonably rel[ies] on, Ashley customers and potential customers have been confused about the origin and/or source of [Defendants'] bedroom suite." (Wanek Aff. ¶ 13). The court finds that this vague and self-serving statement is entitled to no weight. Third, Ashley produces an affidavit from a retailer stating that, based on comments of customers that have shopped for furniture in his stores, he believes that customers have been confused by the similarity in appearance of the Sommerset and the La Dolce Vita. This retailer also states that since the fall of 1997 several customers have complained to him that other stores were selling the Sommerset suite at a lower price, when in fact those stores were selling Defendants' bedroom suite. Ashley has not, however, produced any direct testimony by consumers as to their confusion or any survey evidence to support a finding of customer identification of Sommerset's trade dress with Ashley.

The relatively short period of time in which Sommerset enjoyed exclusive use in the market, the complete lack of consumer advertising which promoted any connection between the Sommerset design and Ashley, the relatively modest sales success enjoyed by Sommerset prior to the introduction of La Dolce Vita, and the thin evidence of any actual confusion in the marketplace preclude any reasonable jury from finding that the consuming public associates the Sommerset design with a certain producer. Ashley is thus unable to demonstrate that Sommerset's trade dress has acquired a secondary meaning.

Because Ashley has failed to demonstrate that it has a protectable trade dress interest in its Sommerset design—either through proof of inherent distinctiveness or secondary meaning—Ashley's claim under Section 43(a) of the Lanham Act fails as a matter of law. The court need not, therefore, reach the question of whether Ashley's trade dress was dictated by functionality or whether the similarity of SanGiacomo's product design to Ashley's product design created a likelihood of consumer confusion.[5]

## II. *Breach of Contract Claim*

In its motion for summary judgment, Ashley seeks a ruling that (1) SanGiacomo copied the Sommerset design in the production of La Dolce Vita; and (2) SanGiacomo breached its contract with Ashley prohibiting such copying. Ashley contends that a finding of copying is compelled by the fact that Ashley's design was first in time and that the competing designs are substantially similar. SanGiacomo denies that it copied the Sommerset design. In support of this position, Defendants have produced testimony of the independent development of La Dolce Vita from a previous SanGiacomo design. Clearly, the issue of whether SanGiacomo copied Ashley's Sommerset design presents a question of fact. Ashley has therefore failed to show that it is entitled to judgment as a matter of law on the issue of copying and on its breach of contract claim.[6]

5. Because the same nucleus of facts appears to underlie Ashley's claims of unfair competition, deceptive trade practices, tortious interference with prospective business advantage, and trade dress infringement, the court's resolution of the trade dress claim appears to be dispositive of these state law claims. The court will order the parties to address this issue at a pre-trial hearing.

6. Although SanGiacomo has not raised the issue in its own dispositive motion, serious questions

### III. *Motion to Dismiss*

 In addition to the parties' cross motions for summary judgment, Defendant Bargagli has moved to dismiss Count VI of Ashley's second amended complaint.[7] Count VI, containing the sole claim against Bargagli, alleges that he tortiously interfered with a contract not to copy between Ashley and SanGiacomo entered into as part of the settlement of prior litigation. Although this court must predict how the Supreme Court of North Carolina would rule regarding the elements of this state law claim, federal law controls whether a complaint in this court states a claim for relief. *McNair v. Lend Lease Trucks, Inc.*, 95 F.3d 325, 328 (4th Cir.1996).

A court may dismiss a claim where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering a motion to dismiss, the court must accept as true all well-pleaded allegations in the plaintiff's complaint in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993), *cert. denied*, 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). The court is not bound, however, to accept legal conclusions cast in the form of factual allegations. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir.1995); *Randall v. United States*, 30 F.3d 518, 522 (4th Cir.

1994), *cert. denied*, 514 U.S. 1107, 115 S.Ct. 1956, 131 L.Ed.2d 849 (1995).

 North Carolina law allows a plaintiff to sue a corporate officer, director or shareholder for tortiously interfering with a contract between the defendant corporation and the plaintiff only where (1) a valid contract existed between the plaintiff and the corporation conferring upon the plaintiff a contractual right against the corporation; (2) the defendant knew of the contract; (3) the defendant intentionally induced the corporation not to perform the contract; (4) the defendant acted without justification and in his own personal interest; and (5) the defendant's actions resulted in damage to the plaintiff. *See Embree Constr. Group, Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498–99, 411 S.E.2d 916, 924–25 (1992).

 In its entirety, Count VI reads:

Tortious Interference with Contract—Mr. Stoffi [sic]

45. Ashley repeats and realleges herein the allegations of Paragraphs 1–44 above.

46. Ashley and SanGiacomo had a valid contract wherein SanGiacomo agreed not to copy Ashley's furniture designs.

47. Upon information and belief, Mr. Stoffi was aware of this contract.

48. Upon information and belief, Mr. Stoffi, without justification, intentionally induced SanGiacomo not to perform its

---

exist as to the validity and enforceability of the alleged oral agreement between Ashley and SanGiacomo not to copy each other's furniture designs. First, the alleged oral agreement, insofar as it seems to set rules for future competition between these competitors in the furniture market, appears to be an agreement in restraint of trade. Such agreements must be in writing in order to be enforceable under North Carolina law. *See* N.C.Gen.Stat. § 75–4. Second, agreements in restraint of trade must be reasonable in order to be enforceable under North Carolina law. *See also Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 226, 333 S.E.2d 299, 303–04 (1985) (stating that a covenant not to compete ancillary to the sale of business must be reasonable as to time, scope, and territory). North Carolina also has a strong interest in free competition. *See Maola Ice Cream Co. v. Maola Milk & Ice Cream Co.*, 238 N.C. 317, 323, 77 S.E.2d 910, 916 (1953) (stating that contracts in partial restraint of trade are contrary to public policy and void if nothing shows them to be reasonable).

The terms of the parties' alleged contract, however, apply to all of Ashley's furniture designs (whether or not Ashley has a protectable interest in the design) in perpetuity. Third, the broad scope of this alleged agreement may include matters beyond the bounds of permissible state regulation. The agreement, for example, would prohibit SanGiacomo from copying an Ashley design even after a federal design patent on it had expired, without any showing of unfair competition or consumer confusion. These questions must be answered before a jury is impaneled and the trial begins. The court will therefore order the parties to address these issues at the pre-trial hearing.

7. Ashley's second amended complaint contains two separate claims for relief titled (Count VI). Bargagli's motion to dismiss and this opinion are directed towards the particular Count VI which is further identified as "Tortious Interference with Contract—Mr. Stoffi [sic]."

obligations under the contract by inducing SanGiacomo to copy Ashley's Sommerset furniture and offer for sale a confusing similar line of furniture.

49. Mr. Stoffi's inducement of SanGiacomo to breach its contract with Ashley resulted in actual damage to Ashley in the form of lost sales and the loss of valuable business goodwill.

50. Ashley is entitled to compensatory and punitive damages.

(Second Am.Compl. ¶¶ 45–50).

Ashley's theory seems to be that because, in its opinion, SanGiacomo breached its contract with Ashley by producing the La Dolce Vita design, and Bargagli was CEO of SanGiacomo, Bargagli therefore tortiously interfered with the contract between Ashley and SanGiacomo. If such an allegation were sufficient, then almost any business dispute between corporations over contractual terms would give rise to a tortious interference claim against the corporate officers. This is not the law. A corporate officer, director, or shareholder is presumed to act in the interests of the corporation, *see Wilson v. McClenny*, 262 N.C. 121, 133–34, 136 S.E.2d 569, 578 (1964), and may be individually liable for procuring the corporation's breach only where the individual's actions were prompted by personal interests apart from the corporation, rather than "legitimate business purposes." *Embree*, 330 N.C. at 500, 411 S.E.2d at 926.

Even if SanGiacomo has breached its contract with Ashley, the facts alleged by Ashley fail to indicate that Bargagli's conduct in procuring this breach was motivated by personal interests rather than business judgments. *See id.*, 330 N.C. at 498–501, 411 S.E.2d at 924–26 (finding that the plaintiff sufficiently alleged lack of justification for tortious interference with contract with allegations that the defendant corporate officials induced the corporation's breach "in their own interest to avoid further liability ... under their [personal] guarantees."). Ashley argues that it is sufficient to allege that Bargagli acted "without justification." (Second Am.Compl. ¶ 48). The court cannot agree. The allegation that Bargagli acted "without justification" is a mere legal conclusion. Even under the liberal rules of notice pleading, Ashley has failed to allege facts from which one can infer that Bargagli's actions were prompted by reasons other than business judgment. Count VI therefore fails to state a claim upon which relief can be granted. Accordingly, the court will dismiss Count VI against Bargagli and dismiss Bargagli from this action.

### CONCLUSION

For the foregoing reasons, the court will grant Defendant SanGiacomo's motion for partial summary judgment, deny Plaintiff's motion for partial summary judgment, and grant Defendant Bargagli's motion to dismiss.

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

### *ORDER and JUDGMENT*

For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED that Plaintiff's motion for partial summary judgment [Doc. # 45] on breach of contract claim is **DENIED.**

IT IS FURTHER ORDERED AND ADJUDGED that Defendant Bargagli's motion to dismiss [Doc. # 82] Count VI is **GRANTED,** and such claim is hereby **DISMISSED** with prejudice.

IT IS FURTHER ORDERED AND ADJUDGED that Defendant SanGiacomo's motion for partial summary judgment [Doc. # 49] on Plaintiff's claim for trade dress infringement is **GRANTED,** and such claim is hereby **DISMISSED** with prejudice.

IT IS FURTHER ORDERED that Plaintiff and Defendant SanGiacomo appear before the court on Monday, July 20, 1998, at 9:30 a.m. in Greensboro, North Carolina, for hearing on (1) the validity and enforceability of the alleged oral contract between them; and (2) whether or not the court's decision to grant partial summary judgment to Defendant SanGiacomo is dispositive of the issues raised by Plaintiff's state law claims of unfair competition, deceptive trade practices, and tortious interference with prospective business advantage. Any additional authority that the parties wish to submit to the court

on these issues must be filed in the Clerk's Office by 5:00 p.m. on Thursday, July 16, 1998. Jury selection in this case, if necessary, will begin at 9:30 a.m. on Tuesday, July 21, 1998.

### ORDER and JUDGEMENT

On July 14, 1998, the court ordered the parties to appear at a hearing and discuss the issues and claims remaining in this case. The parties have since entered into a stipulation whereby they agreed for the court to dispose of the remaining claims on the existing record. The remaining claims, all of which arise under state law, are: breach of an oral agreement not to copy each other's furniture designs; common law unfair competition; violation of North Carolina's Unfair and Deceptive Trade Practices Act; and tortious interference with prospective business advantage.

 The alleged contract between Plaintiff Ashley and Defendant SanGiacomo, applying to all of the parties' furniture designs in perpetuity, is one restraining trade because it limits competition. Under North Carolina law, contracts in restraint of trade must be in writing. See N.C.Gen.Stat. § 75-4. The parties agree, however, that the alleged agreement was oral rather than written. Ashley's contract claim therefore fails as a matter of law.

 Although Ashley included in its complaint allegations of common law unfair competition, violation of North Carolina's Unfair and Deceptive Trade Practices Act, and tortious interference with prospective business advantage, in addition to its Lanham Act claim, the factual basis of these state law claims is the same as that underlying the Lanham Act claim. In fact, counsel for Ashley admits that Ashley has no evidence to support these state law claims other than that which it presented on its Lanham Act claim.

The North Carolina common law of unfair competition is similar to the Lanham Act in that a defendant's unfair acts are actionable when they damage a plaintiff's legitimate business interests. See Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987). The North Carolina unfair trade practices statute prohibits unfair methods of competition and unfair or deceptive trade

practices. See N.C.Gen.Stat. § 75–1.1. The North Carolina common law of tortious interference with prospective business advantage prohibits the unjustified inducement of a third party to refrain from entering into a contract with the plaintiff. See Spartan Equip. Co. v. Air Placement Equip. Co., 263 N.C. 549, 559, 140 S.E.2d 3, 11 (1965).

Ashley cannot succeed on these state law claims. North Carolina law fully supports competition through imitation absent a likelihood of confusion and the employment of unfair or unreasonable practices. See Devan Designs v. Palliser Furniture Corp., 1992 WL 511694, 25 U.S.P.Q.2d 1991, 2002 (M.D.N.C. Sept.15, 1992); Cameron v. New Hanover Mem. Hosp., 58 N.C.App. 414, 441, 293 S.E.2d 901, 917 (1982) (quoting Prosser, Law of Torts § 130 at 954–55 (4th ed.1971)). The court found in its memorandum opinion issued July 14, 1998, that Ashley had no protectable trade dress in the design of its furniture in this case. Accordingly, SanGiacomo's conduct in producing a similar competing product is not unethical, unscrupulous, unfair, or unreasonable. Ashley's claims of common law unfair competition, violation of the Unfair and Deceptive Trade Practices Act, and tortious interference with prospective business advantage therefore fail as a matter of law.

NOW, THEREFORE, IT IS ORDERED AND ADJUDGED THAT Ashley's claims of breach of contract, common law unfair competition, violation of North Carolina's Unfair and Deceptive Trade Practices Act, and tortious interference with prospective business advantage be DISMISSED, and this action is hereby **DISMISSED** with prejudice.